IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH KUHN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 07-00625 |
| | : | |
| v. | : | |
| | : | |
| THE PRUDENTIAL INSURANCE | : | |
| COMPANY OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

Giles, J.                                                                                          May 1, 2008

**I.  Introduction**

Before the court are Plaintiff Deborah Kuhn and Defendant Prudential Life Insurance

Company of America's cross-motions for summary judgment.  Plaintiff brings suit against

Defendant, pursuant to Section 502(a) of the Employee Retirement and Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1132(a), arising out of Defendant's termination of Plaintiff's long-

term disability ("LTD") benefits.  The issues raised by the motions and determined by the court

are: (1) whether Defendant's determination, that Plaintiff's diagnosis of fibromyalgia was not an

impairment that would prevent Plaintiff from performing the duties of her sedentary occupation,

was arbitrary and capricious, and, specifically, whether Defendant improperly required objective

medical evidence to prove the claim of fibromyalgia, which by its nature cannot be proven by

objective medical evidence; and (2) whether Defendant's decision to apply a mental health

limitation duration of twenty-four months to Plaintiff's claim for LTD benefits was arbitrary and

capricious.

Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Judgment is DENIED herein for the reasons that follow.  In short, applying the slightly heightened form of arbitrary and capricious review agreed to by the parties, the court finds that Defendant improperly required objective medical evidence for Plaintiff to prove her claim of fibromyalgia.  Defendant asked its reviewing doctors to assess Plaintiff's fibromyalgia claim through the lens of objective medical evidence and then relied on the resulting assessments to find that no physical findings substantiated Plaintiff's claim of fibromyalgia.  Defendant's implied requirement of objective medical evidence to prove fibromyalgia, a condition based on subjective complaints of pain which cannot be proved objectively, created an impossible hurdle for Plaintiff to overcome and would have the effect of arbitrarily and capriciously precluding all fibromyalgia claimants from receiving LTD benefits.

Defendant's denial of LTD benefits as to Plaintiff's fibromyalgia claim was therefore arbitrary and capricious because it was not supported by substantial evidence and was erroneous as a matter of law.  Because the court finds that Defendant's determination that Plaintiff's diagnosis of fibromyalgia was not an impairment that would prevent Plaintiff from performing her job duties was arbitrary and capricious and by itself necessitates reinstatement of LTD benefits, the court does not fully reach Defendant's decision to apply a mental health limitation. Plaintiff is entitled to reinstatement of her LTD benefits retroactive from July 1, 2004, and clarification of her rights to future benefits under the Policy, but not to the injunctive relief sought.

## **II.  Factual Background**

Plaintiff is a 53-year old woman who was employed as an administrative assistant at Eclipsys Corporation until October 31, 2001, when she stopped working due to a diagnosis of interstitial cystitis.  (Admin. R. PRU (hereinafter "PRU") 000476-79.)  As of the start of her employment on August 7, 2000, Plaintiff's medical records show that she was not treating for any mental health issue, and had received marital therapy and therapy regarding a relationship in the late 1990s.  (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 3-4; PRU 000466.)

On April 9, 2002, Plaintiff filed a claim for LTD benefits under Group Contract LG-67087-FL (the "Policy") issued to her employer, complaining that she was unable to work due to pain in her pelvic area, tiredness, frequent urination, depression, irritability, restlessness, and irregular sleeping.  (PRU 000479-80.)  It is undisputed that the Policy is an employer-sponsored benefit program that is subject to the terms of ERISA, 29 U.S.C. § 1001, et seq.[1]

The Policy defines total disability as follows:

> "Total disability" exists when Prudential determines that all of these conditions are met:
>
> (1)      Due to Sickness or accidental Injury, both of these are true:
>
>       (a)      You are not able to perform, for wage or profit, the material and substantial duties of your occupation.
>
>       (b)      After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your

---

[1]  The Policy provides:
This Group Contract underwritten by The Prudential Insurance Company of America provides the insured benefits under your Employer's ERISA plan(s). The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits.  The decision of the Claims Administrator should not be overturned unless arbitrary and capricious.
(PRU 000028.)

education, training or experience.  The Initial Duration is shown in
the Schedule of Benefits.

(2)     You are not working at any job for wage or profit.

(3)     You are under the regular care of a Doctor.

(PRU 000011.)  Under the policy, "sickness" is defined as:

Any disorder of the body or mind of a Covered Person, but not an Injury;
pregnancy of a Covered Person, including abortion, miscarriage or childbirth.

(PRU 000022.)

The Policy's benefit limitation provision provides:

This Section applies if your Disability, as determined by Prudential, is caused at
least in part by a mental, psychoneurotic or personality disorder.  In that case,
benefits are not payable for your Disability for more than 24 months.  There are
exceptions if you are disabled at the end of the twenty-fourth month for which
benefits are payable:

(1)     If you are Confined in a Hospital for one or more of the disorders above at
the end of the twenty-fourth month, the following will apply.  While you
remain Disabled, benefits are payable for the duration of that Confinement
and, unless (2) below applies, for up to three additional months after your
Confinement ends.

(2)     If, after the twenty-fourth month, you become Confined in a Hospital for
one or more of the disorders above for at least 14 consecutive days, the
following will apply.  While you remain Disabled, benefits are payable for
the remaining duration of that Confinement and for up to three additional
months after your Confinement ends.

(PRU 000014.)

On April 29, 2002, Defendant approved LTD benefits, effective May 1, 2002, due to

Plaintiff's condition of interstitial cystitis.  (PRU 000437.)  Defendant relied on the attending

physician's statement completed by Plaintiff's urologist, Dr. Kenneth J. Fitzpatrick, M.D.  It

stated that Plaintiff was diagnosed with interstitial cystitis and identified her pelvic pain as the

medical obstacle to returning to work.  (PRU 000476-77.)  Plaintiff received LTD benefits under

the Policy from May 1, 2002 until July 1, 2004.

On June 3, 2002, Plaintiff filed an application for disability benefits with the Social Security Administration, alleging that she became disabled on October 30, 2001 due to interstitial cystitis, pelvic pain, depression, and hypertension.  (PRU 000335.)  Her claim was denied on October 22, 2002, and a hearing was held before an Administrative Law Judge ("ALJ") on May 22, 2003.  (Id.)  On July 10, 2003, the ALJ concluded that Plaintiff was disabled due only to the mental impairment of depression since September 28, 2002, the date on which the ALJ found Plaintiff's depression to have seriously increased.  (PRU 000336-37, 000341.)  Prior to that date and with respect to other claimed impairments, however, the ALJ found that Plaintiff was not disabled for the period of October 30, 2001 through September 27, 2002 because she was capable of light work, subject to certain nonexertional limitations, for which jobs were available locally and in the national economy.  (PRU 000337-40, 000342.)  Plaintiff represents that as of June 30, 2004, she was receiving Social Security Disability Income benefits.  (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 4.)

On December 23, 2002, Defendant terminated Plaintiff's LTD benefits, finding that Plaintiff was no longer disabled from performing her sedentary duties as an administrative assistant.  (PRU 000428-29.)  In its denial letter, Defendant cited medical records from Dr. Fitzpatrick indicating that Plaintiff's condition of interstitial cystitis had improved following insertion of an Interstim S3 nerve root stimulation device on July 17, 2002.  (PRU 000428-29, 000446-47.)  On November 8, 2002, Dr. Fitzpatrick stated that Plaintiff was "greatly improved" and responding well "in terms of her frequency, urgency and pelvic pain."  (PRU 000441-42.)  Defendant concluded that there was "no objective medical documentation to support Total Disability."  (PRU 000429.)

On January 7, 2003, Plaintiff appealed the termination of her LTD benefits. (PRU 000424-26.) In her appeal, Plaintiff stated that she was permanently disabled due to her condition of interstitial cystitis, and continued to experience pain, abdominal cramping, problems with urination, irritability, and depression. (Id.)

On March 27, 2003, Defendant upheld its decision to terminate Plaintiff's LTD benefits, finding that Plaintiff's medical records did not provide evidence of any physical or mental impairment that would prevent Plaintiff from performing the duties of her sedentary occupation. (PRU 000391-93; see PRU 000495.) Defendant cited medical records from Dr. Fitzpatrick, which stated that the stimulator implant was functioning properly and referred Plaintiff to a pain clinic for complaints of chronic pelvic pain, as well as records from Dr. Alan Gardner, M.D., Plaintiff's psychiatrist, which noted that Plaintiff was taking medications for treatment of depression. (PRU 00392; see PRU 000400.)

On August 18, 2003, Plaintiff filed a second appeal. (PRU 000311-22.) She provided additional medical records from her psychiatrist, Dr. Gardner, and urologist, Dr. Fitzpatrick, and submitted the results of her social security disability benefits hearing, including a report from her September 2002 disability examination with William M. Waid, Ph.D. (PRU 000331-352, 000363-67, 000373-74, 000398-400.) Dr. Waid's report indicated a diagnosis of chronic pain and adjustment disorder with depressed mood, and concluded that Plaintiff "was suffering from the emotional consequences of a debilitating physical condition, which also produces severe chronic pain." (PRU 000385.) An April 24, 2003 letter from Dr. Gardner states that Plaintiff has severe depression and that the combination of depression and severe chronic pain from interstitial cystitis justifies disability. (PRU 000353.) A May 16, 2003 letter from Dr. Fitzpatrick

confirmed that Plaintiff continued to have interstitial cystitis.  (PRU 000323.)  In other letters,

Dr. Fitzpatrick noted that although Plaintiff had relief with her urgency and frequency from the

S3 Interstim implant, she continued to suffer from pelvic pain, back pain, emotional distress, and

dyspareunia.  (PRU 399-400.)  On August 12, 2003, Dr. Fitzpatrick noted that Plaintiff decided

to remove her Interstim device.  (PRU 000398.)

In light of the new information submitted by Plaintiff, Defendant requested an

Independent Medical Evaluation from Dr. Mark C. Cox, a psychiatrist.  (PRU 000300-04.)  In

Dr. Cox's October 16, 2003 evaluation, Plaintiff reported symptoms of pain, urgency, and

frequency of urination, difficulty concentrating, depression, tremors, short term memory loss, and

numbness in the face.  (PRU 000300-01.)  Dr. Cox's diagnosis, in part, was major depressive

disorder and chronic pain disorder associated with both psychological features and a general

medical condition.  (PRU 000303.)  Dr. Cox opined that Plaintiff was "vocationally disabled

solely due to psychological/mental status," as her mood was severely depressed.  (PRU 000304.)

He remarked that she made involuntary hand and leg movements, her cognition was impaired,

and her attention was discontinuous.  (Id.)

On November 5, 2003, after completing a review of Plaintiff's second appeal, Defendant

determined that Plaintiff was eligible for additional benefits due solely to her depression.  (PRU

000293-94; see PRU 000497.)  Her claim was reinstated effective January 1, 2003.  (Id.)

Defendant did not include reasons for its determination in its decision letter.  (See PRU 000293-

94.)  Defendant's internal records reveal that Dr. Cox's report and opinion formed the basis for

its determination.  (See PRU 000497.)  Plaintiff continued to submit medical records to

Defendant, including records from Dr. C.P. Binning, M.D., M.R.C.P., a neurologist; Dr. Heidar

K. Jahromi, M.D., P.C., another neurologist; Plaintiff's April 8, 2004 MRI results, which contained a notation of white matter disease compatible with multiple sclerosis, (PRU 000267-68; see PRU 000500); and records from Dr. Gardner, her psychiatrist, (PRU 000269-81).

On July 31, 2003, Dr. Jahromi opined that Plaintiff's neurological examination was within normal range, and noted that her symptoms were "very subjective and non-specific." (PRU 000222-23.)  Dr. Jahromi reported that Plaintiff's chief complaints were "shakes, tremors, loss of balance, memory loss, numbness and tingling."  (PRU 000222.)  He also noted that Plaintiff has had depression off and on for the past thirty years.  (Id.)

Dr. Binning, Plaintiff's neurologist, conducted evaluations of Plaintiff from about March 23, 2004 to October 13, 2004.  On March 30, 2004, Dr. Binning described Plaintiff's complaints as including general numbness, spasms in the limbs, headaches, memory loss, severe depression, and severe abdominal, lower back, and lower extremity pains.  (PRU 000240.)  He reported that Plaintiff's pain persisted despite various treatments, including the implantation device and multiple oral medications.  (Id.)  Dr. Binning also reported that Plaintiff had been complaining of depression for the previous thirty years.  (Id.)  Dr. Binning opined that Plaintiff's symptoms were more likely due to fibromyalgia and underlying depression than other possible diseases.  (Id.)

On April 19, 2004, after reviewing Plaintiff's MRI results, Dr. Binning stated that he did not believe that Plaintiff had multiple sclerosis but that she suffered from "chronic pain syndrome with pain in the limbs, particularly in the lower extremities."  (PRU 000239, 000250.)  On April 23, 2004, Dr. Binning stated that he believed Plaintiff has fibromyalgia and that the "pains and soreness in the muscles and stiffness in the limbs with depression" was suggestive of this diagnosis.  (PRU 000238, 000251.)  On May 13, 2004, he reiterated that her symptoms were

suggestive of a "fibromyalgia type syndrome." (PRU 000237, 000249.)

On June 24, 2004, Defendant terminated Plaintiff's LTD benefits, effective July 1, 2004, finding that Plaintiff no longer met the definition of total disability, for a disability due in whole or in part to mental illness, which has a limited pay period of twenty-four months. (PRU 000258-63.) Defendant did not include bases for its determination in its decision letter. (Id.) However, in its internal records, Defendant noted that Plaintiff requested removal of the S3 Interstim implant in August 2003 and stopped treating with her urologist. (PRU 000503.) Defendant concluded that the lack of treatment indicated that there was no longer an impairment due to interstitial cystitis. (PRU 000503-04.) Defendant noted that MRI examinations yielded no focal neurological deficits compatible with a diagnosis of multiple sclerosis. (Id.)

In its internal record, Defendant also noted that Dr. Binning considered Plaintiff's symptoms compatible with fibromyalgia, but Defendant did not consider fibromyalgia an impairing condition to perform regular occupational sedentary work. (PRU 000503.) Defendant stated, "Although your symptoms are consistent with Fibromyalgia, the severity of your symptoms are not considered severe and would not be expected to preclude you from performing your occupational duties." (PRU 000504.) Defendant also noted that the neurological exam by Dr. Jahromi was normal and there was no need for further neurological investigation. (PRU 000503.) Presumably relying on Dr. Cox's evaluation, Defendant concluded that the sole source of Plaintiff's disability was her psychological/mental status, the benefit duration for which is limited to twenty-four months. (PRU 000503-04.)

On November 19, 2004, Plaintiff appealed Defendant's decision to terminate her LTD benefits, claiming that her symptoms remained severe and that she was likely disabled due to

multiple sclerosis, fibromyalgia, lyme disease, and chronic pain syndrome, in addition to secondary depression.  (PRU 000229-30; see PRU 000147.)  She submitted medical records in support of her claim.

On August 17, 2004, Dr. Binning, Plaintiff's neurologist, again described Plaintiff's complaints as including: pains in the lower legs, lower back pain, arm and neck pain, tingling in the scalp, pain in the eyes, blurry vision, nausea, headaches, numbness in the face, tingling in the arms and legs, forgetfulness, spasms in the limbs, numbness in the lower abdomen and buttocks, and pain during intercourse.  (PRU 000236, 000248.)  Dr. Binning noted that Plaintiff's symptoms were gradually worsening and that she "is hurting all over and is miserable."  (Id.)  Despite finding some white matter lesions in the brain, he reported that Plaintiff had not presented in typical multiple sclerosis fashion, and that her symptoms were "more of a chronic, severe pain in a generalized manner."  (Id.)  After reviewing a battery of tests and ruling out various possible diseases, Dr. Binning wrote, "I am at a loss of how to manage her symptoms."  (Id.)

In his final letter in the record, dated October 13, 2004, Dr. Binning reported that Plaintiff's "CSF" analysis was normal and her lyme disease test was negative.  (PRU 000247.)  Plaintiff continued to complain of burning sensation, numbness, and tingling in the hands and arms, pains in the limbs, and severe headaches with neck pain.  (Id.)  Dr. Binning was unsure as to a possible multiple sclerosis diagnosis, and stated that he did "not really know what the exact diagnosis is."  (Id.)  He believed that the interstitial cystitis triggered the pain syndrome.  (Id.)  He referred her to another hospital for evaluation.  (Id.)

On October 22, 2004, Dr. Philip A. Adelman, M.D., a third neurologist, described his

evaluation of Plaintiff.  (PRU 000242-43.)  Plaintiff complained to him of burning and numbness in her arms, jerking in limbs at night, pain in her head, facial numbness, tingling and numbness in limbs, tiredness, forgetfulness, and jolts of pain in her right leg.  (PRU 000242.)  Dr. Adelman commented that Dr. Binning performed a thorough evaluation and, after reviewing the various MRI test results, Dr. Adelman concluded that they appeared normal.  Dr. Adelman concluded that Plaintiff "has a variety of symptoms though a paucity of signs," discounted multiple sclerosis or central nervous system process disease, and was "most concerned about fibromyalgia."  (PRU 000242-43.)  He referred her for a rheumatologic evaluation.  (PRU 000243.)

On March 8, 2005, Plaintiff's family doctor, Dr. Earl R. Trievel, D.O., opined in a letter and job capabilities form that Plaintiff was totally disabled and incapable of working due to a diagnosis of debilitating central nervous system disease, most likely multiple sclerosis, based on evaluations and MRI studies.  (PRU 000165-71.)

Prudential referred the case for an internal medical review by Dr. Charles Bock, M.D., specializing in neurology.  (PRU 000147, 000160-61, 000151-58.)  Among the questions posed by Defendant to the internal medical reviewer was whether Plaintiff's complaints were based on "objective findings" and "objective evidence" or only on "self-reported symptoms," and whether her reported symptoms were supported by "a physical etiology versus psychological etiology." (PRU 000151, 000161, 000508.)

After reviewing Plaintiff's medical records, on June 7, 2005, Dr. Bock concluded that, although the medical records indicated many subjective symptoms, they did not contain any "objective findings on neurologic examination of any weakness or sensory problem."  (PRU 000151, 000156.)  As to the possible diagnosis of fibromyalgia, Dr. Bock stated that "there is no

indication of physical findings on examination which support this diagnosis on a clinical basis."
(PRU 000156.)  Dr. Bock ruled out multiple sclerosis because the history of presentation and
physical findings were inconsistent with diagnosis.  (Id.)  He also found that laboratory
evaluation demonstrated no evidence of systemic inflammatory condition.  (Id.)  He concluded
that, from a neurologic perspective, there was no objective evidence to support Plaintiff being
functionally impaired from performing her sedentary job duties as of July 1, 2004.  (Id.)

On June 14, 2005, Defendant affirmed for the first time its previous June 24, 2004
decision denying Plaintiff LTD benefits as of July 1, 2004.  (PRU 000146-49.)  In its decision,
Defendant determined that the documentation submitted by Plaintiff did "not support a sickness
or injury, not subject to the benefit limitation, that would preclude" Plaintiff from performing her
job duties, and that her complaints were intermittent and did not support a continuous
impairment.  (PRU 000148.)  Defendant relied upon Dr. Bock's determination that Plaintiff's
physical examinations did not reveal abnormal neurological findings or evidence of
radiculopathy or neuropathy.  (PRU 000147.)  Defendant determined that there were no
symptoms to support carpal tunnel.  (Id.)  Regarding Plaintiff's fibromyalgia claim, Defendant
stated that "the medical records do not reveal any specific findings on physical examination to
support this diagnosis."  (Id.)  Pointing to Dr. Binning's evaluations, Defendant ruled out
multiple sclerosis.  (Id.)  Defendant also found that the medical records did not document
findings consistent with lyme disease.  (Id.)  Defendant did not include any determination
regarding depression.  (See PRU 000147-48.)

On June 21, 2005, Plaintiff appealed the decision to terminate her LTD benefits for a
second time.  (PRU 000144.)  Prudential referred the case for an internal medical review by Dr.

Richard Day, M.D.  (PRU 000138, 000508-10.)  One of Defendant's questions posed to Dr. Day was "what type of objective findings would be expected to explain [the] etiology" of Plaintiff's complaints.  (PRU 000508-09.)

In his report, dated August 2, 2005, Dr. Day includes a description of Dr. Binning's evaluation, noting that Dr. Binning's opinion suggested that Plaintiff's condition of pain is related to fibromyalgia and not multiple sclerosis.  (PRU 000509-10.)  Dr. Day further stated: "The fibromyalgia is a subjective chronic pain problem.  No restrictions would be placed for this and the limitations are related to the subjective pain complaints."  (PRU 000510.)  Based on objective findings, Dr. Day did not find evidence to support diagnoses of multiple sclerosis and lyme disease.  (PRU 000509-10.)  He indicated that the pain, urgency, and frequency associated with interstitial cystitis was subjective and that, although past medical studies were consistent with that diagnosis and the symptoms apparently flared up in September to November 2004, there was no new information regarding the condition.  (PRU 000509-11.)  Dr. Day also stated that Dr. Cox noted that depression was a "significant problem resulting in impairment."  (PRU 000510.)

On August 29, 2005, Defendant reaffirmed its decision for the second time.  (PRU 000137-40.)  Defendant determined that the diagnoses of multiple sclerosis or lyme disease was not consistent with clinical findings.  (PRU 000138-39.)  Defendant also determined that because Plaintiff had not treated for interstitial cystitis from September 2003 until the time her benefits were terminated, she was not impaired from this disease.  (PRU 000139.)  Although Dr. Day's report addressed Plaintiff's fibromyalgia claim, Defendant's decision does not mention Plaintiff's fibromyalgia claim.  Defendant determined that Plaintiff's depression was the underlying cause

of her symptoms, stating:

> Ms. Kuhn's medical records reflect that she has had a 30 year history of significant depression.  Dr. Fitzpatrick has indicated that the primary reason precluding Ms. Kuhn from returning to work is her Depression and referred her for further psychiatric treatment.  Ms. Kuhn's file was referred for an external review by a Board Certified Psychiatrist who found that Ms. Kuhn's conditions and inability to work were related to her psychiatric conditions.

(PRU 000138.)  Because the depression was present since her initial benefit payment, Defendant determined that Plaintiff was subject to the 24-month limitation for disabilities related to mental illness and that she had received the allowable maximum duration of benefits.  (PRU 000139.)

Plaintiff timely appealed for a third time on November 14, 2005, and submitted medical records in support of her claim for fibromyalgia.

On October 6, 2005, Dr. Burton T. Mark, Medical Director of  the Universities Services Sleep Diagnostic and Treatment Centers, described his initial evaluation of Plaintiff, noting that she was the sole informant at the time of the evaluation.  (PRU 000122-23.)  Dr. Mark indicated that Plaintiff's primary sleep complaints related to chronic fatigue and daytime somnolence. (PRU 000122.)  He described that Plaintiff reported that she generally has interrupted sleep from about 8:30 p.m. to 11:00 a.m. and usually naps two to three hours during the daytime most days a week.  (Id.)  Dr. Mark stated, "Her complaints of daytime fatigue have been linked with the diagnosis of fibromyalgia and a variety of other medical complaints."  (Id.)  He noted that Plaintiff had "hypertension, fibromyalgia, interstitial cystitis, chronic depression and paresthesias and dythesias of her extremities" and was being treated for fibromyalgia, chronic interstitial cystitis, and chronic pain.  (Id.)

On October 14, 2005, Plaintiff underwent a sleep study at the Universities Services Sleep

Diagnostic and Treatment Centers.  (PRU 000118-21.)  On October 20, 2005, Dr. Mark stated that the diagnoses of Simple Snoring and Restless Leg Syndrome were established, and did not mention Plaintiff's fibromyalgia complaints.  (PRU 000118.)  In a follow-up visit note dated November 1, 2005, Dr. Mark stated that he had discussed with Plaintiff evidence of alpha intrusion regarding her complaints of fibromyalgia.  (PRU 000117.)  On December 8, 2005, Dr. Mark clarified the diagnoses established after Plaintiff was evaluated at the sleep center.  (PRU 000115.)  He stated that, although Simple Snoring and Restless Leg Syndrome were identified at the time, "the diagnosis of fibromyalgia is likely."  (Id.)  He further stated, "[T]he sleep study demonstrated a particular pattern known as alpha intrusion throughout the study.  Those arousals are consistent with patients having chronic pain and a diagnosis of Fibromyalgia."  (Id.)

On September 30, 2005, Dr. Thomas J. Whalen, Plaintiff's rheumatologist, in a note stated that Plaintiff was totally disabled due to lyme disease.  (PRU 000136.)  On November 5, 2005, following a comprehensive rheumatologic evaluation of Plaintiff on August 12, 2005, Dr. Whalen changed his prior diagnosis of lyme disease and diagnosed Plaintiff with "post-lyme fibromyalgia syndrome associated with a sleep disorder," based on her history, physical examination, and recent sleep study.  (PRU 000129.)  He stated that Plaintiff "had lyme disease in 1995 with a typical bull's eye rash" and that fibromyalgia symptoms occur in approximately thirty to forty percent of lyme cases.  (Id.)  Dr. Whalen stated within a reasonable degree of medical certainty that Plaintiff was "disabled from gainful employment," based on her pain, "fatigue, cognitive defects, need for almost constant positional changes, and the frequency that she would be absent."  (Id.)

On November 14, 2005, Dr. Trievel, Plaintiff's family doctor, changed his prior diagnosis

of a central nervous system disease, likely multiple sclerosis, and diagnosed Plaintiff with

fibromyalgia.  (PRU 000128, 000165.)  Specifically, Dr. Trievel stated:

> After many years of treating Ms. Deborah Kuhn, with multiple specialty exams,
> extensive laboratory and specialty testings, my medical diagnosis is fibromyalgia.
> This firm diagnosis is made upon personal physical examinations on multiple
> occasions.  The review of multiple neurologic, orthopedic, infectious disease,
> psychiatric reports along with voluminous lab data makes any other diagnosis
> outside the limits of medical probability.

(PRU 000128.)

Nevertheless, on April 27, 2006, Defendant reaffirmed its decision for the third and final

time.  (PRU 000080-83.)  Defendant reported that it had considered the additional evidence

submitted by Plaintiff, including medical records from Dr. Whalen, Dr. Trievel, and Dr. Mark

from September 30, 2005 to December 8, 2005.  (PRU 000081.)  Based on medical records and

diagnostic test results, Defendant determined that Plaintiff's condition was not consistent with

multiple sclerosis and lyme disease.  (PRU 000081-82.)  Because Plaintiff had not been treated

for chronic interstitial cystitis as of September 2003, Defendant concluded that interstitial cystitis

was not causing her symptoms and did not by itself preclude work capacity.  (PRU 000082.)

As to Plaintiff's fibromyalgia claim, Defendant stated:

> Additionally, we note you have indicated Ms. Kuhn has been diagnosed with
> Fibromyalgia.  You [sic] letter dated December 15, 2005, with which you
> enclosed a letter from Dr. Burton Mark dated December 8, 2005, indicates Ms.
> Kuhn's diagnosis of Fibromyalgia is confirmed by the sleep study completed on
> October 7, 2005.  As indicated above, we have determined that there is not
> sufficient medical evidence to support impairment in Ms. Kuhn's functioning
> beyond June 30, 2004.  All information provided on third appeal is dated between
> September 30, 2005 and December 8, 2005, approximately 17 months after the
> time we determined Ms. Kuhn no longer met the policy definition of disability.
> These most recent medical records dated September 30, 2005 through December
> 8, 2005 are insufficient to determine work impairment restriction or limitations in
> Ms. Kuhn's functioning as of June 30, 2004.  Therefore, we have upheld our

decision to terminate Ms. Kuhn's claim for Long Term Disability benefits
effective July 1, 2004.

(PRU 000082.)

Having eliminated these diseases, Defendant concluded that Plaintiff's depression was

the underlying cause of her symptoms, stating:

> Ms. Kuhn has a significant history of Depression which her physicians have
> indicated that this is contributing to her physical complaints and symptomology.
> The medical notes provided indicate that depression is the underlying cause of her
> symptoms.  Ms. Kuhn's psychiatric impairment has been present since Ms.
> Kuhn's initial benefit payments beginning on April 29, 2002.  As stated in the
> policy provision outlined above, any disability which is caused at least in part by a
> mental, psychoneurotic or personality disorder is subject to a 24-month benefit
> limitation.  This limitation expired on April 28, 2004.  Therefore, it is our
> determination that Ms. Kuhn has received the maximum duration of benefits
> allowable under the policy for a mental health condition.

(PRU 000082.)

Plaintiff filed three timely appeals for reconsideration, and there is no dispute that

Plaintiff has exhausted her administrative remedies.  On February 15, 2007, Plaintiff filed the

present action.  In addition to seeking the reinstatement of LTD benefits retroactive to July 1,

2004 and clarification of her rights to future benefits under the Policy, Plaintiff seeks injunctive

relief pursuant to 29 U.S.C. § 1132(a)(3).  She asks the court to enjoin Defendant from: (1) using

unlimited discretion in interpreting the Policy's language to determine whether a disability is

caused at least in part by a mental disorder; (2) interpreting the Policy's language to mean that

disabilities not caused at least in part by a mental disorder but that have depression and other

mental illness symptoms as secondary consequences, such as fibromyalgia, are barred from

benefits after twenty-four months; and/or (3) relying solely on, or requiring that its independent

medical evaluators rely solely on, objective criteria in determining the existence of disability in

chronic pain cases, such as fibromyalgia.  (Compl. 13; Pl.'s Mem. of Law in Supp. of Pl.'s Mot.

for Summ. J. 5-6.)

### III.  Legal Standard for Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.  In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).  On cross-motions for summary judgment, the standard of review does not change.  Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968).  Each moving party must independently show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Id.; see Fed. R. Civ. P. 56.

**IV.  Discussion**

A.     ERISA Standard of Review.

The parties do not dispute that this matter is governed by ERISA or the applicable standard of review.  ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

ERISA does not provide a standard of review for an improper denial of benefits claim. Post v. Hartford Ins. Co., 501 F.3d 154, 160 (3d Cir. 2007).  The U.S. Supreme Court held that the default standard of review in § 1132(a)(1)(B) cases is *de novo*, but noted that where a plan gives the administrator discretion, the administrator's decision should be upheld unless there is an abuse of discretion, under an arbitrary and capricious standard.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Post, 501 F.3d at 160-61.  A decision is arbitrary and capricious if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 392 (3d Cir. 2000).  The Court further noted, however, that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"  Firestone, 489 U.S. at 15 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)).

Where there is a conflict of interest, the Third Circuit follows a "sliding scale" standard of review to determine whether the administrator abused its discretion.  Post, 501 F.3d at 161-62; Pinto, 214 F.3d at 392.  Under this standard of review, "if the level of conflict is slight, most of

the administrator's deference remains intact, and the court applies something similar to

traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most

of its discretion is stripped away."  Post, 501 F.3d at 161 (citations omitted).  This sliding scale

review allows a court to "review[] the merits of the [administrator's] interpretation to determine

whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests

that conflict with those of beneficiaries."  Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d

250, 254 (3d Cir. 2004) (quoting Pinto, 214 F.3d at 391).

     The Third Circuit describes the application of the sliding scale standard of review as

follows:

> [C]ourts first consider the evidence that the administrator acted from an improper
> motive and heighten their level of scrutiny appropriately.  Second, [courts] review
> the merits of the decision and the evidence of impropriety together to determine
> whether the administrator properly exercised the discretion accorded it.  If so, the
> decision stands; if not, the court steps into the shoes of the administrator and rules
> on the merits itself.

Post, 501 F.3d at 161-62 (citations omitted).  The court's "touchstone" is to make "a common-

sense decision based on the evidence whether the administrator appropriately exercised its

discretion."  Id. at 162.

     The parties do not dispute that the Policy gives the administrator discretionary authority

to determine eligibility for benefits or to construe the terms of the Plan, which requires the abuse

of discretion standard of review.  See Firestone, 489 U.S. at 115; (PRU 000028).  Nor do the

parties dispute that there is a conflict of interest because Defendant both funds and administers

benefits under the Policy, and that its benefit determinations therefore are subject to a heightened

form of the arbitrary and capricious standard of review.  See Pinto, 214 F.3d at 383.  The parties

have agreed to a "slightly heightened" arbitrary and capricious standard of review.  (Pl.'s Mem.

of Law in Supp. of Pl.'s Mot. for Summ. J. 15; Def.'s Mot. for Summ. J. ¶ 39.)  Thus,

Defendant's decision should only be overturned if it is without reason, unsupported by

substantial evidence, or erroneous as a matter of law.  Orvosh v. Program of Group Ins. for

Salaried Employees of Volkswagen of Am. Inc., 222 F.3d 123, 129 (3d Cir. 2000).

Under this heightened arbitrary and capricious standard, the court looks to the record as a

whole, consisting of the evidence that was before Defendant when it made the decisions under

review.  See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997).

**B.      Application of the Slightly Heightened Arbitrary and Capricious Standard.**

Plaintiff asserts that she has been disabled due to fibromyalgia since June 30, 2004.  (Pl.'s

Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. 2.)  She argues that the totality of the medical

evidence supports her fibromyalgia disability claim and has not been rebutted by competent

medical authorities.  Plaintiff argues that fibromyalgia is the cause of her disability, and that her

depression is a result of her fibromyalgia, and not the cause.  She contends that she did not have a

pre-existing mental disorder before the onset of chronic pain.  She further argues that an

employee is entitled to coverage under the Policy even if the employee has more than one

disability at a time, a second disability grows out of a prior one, or a second disability develops

concurrently with, but independently of, a prior one.

Plaintiff argues that Defendant's method of analysis of Plaintiff's claims has two fatal

flaws that render its decision arbitrary and capricious.  (Pl.'s Mem. of Law in Supp. of Pl.'s Mot.

for Summ. J. 1.)  First, Plaintiff argues that Defendant improperly applied its mental health

limitation to what Plaintiff characterizes as her fibromyalgia claim.  Second, Plaintiff argues that

Defendant improperly sought clarification from its independent medical evaluators whether a disability existed based solely on objective evidence. Plaintiff contends that the net effect of this approach would be of denying all fibromyalgia claims.

Defendant argues that Plaintiff's benefits are subject to the mental illness benefit limitation duration of twenty-four months because her disability was caused at least in part by a mental, psychoneurotic, or personality disorder. (See PRU 000014.) Defendant contends that Plaintiff's sole disability from January 1, 2003 to June 30, 2004 was depression. Defendant further argues that Plaintiff's claim that her depression was secondary to her physical conditions of fibromyalgia and chronic pain, among others, is not based on any evidence in the record. Defendant, in effect, argues that Plaintiff had not been diagnosed with any physical condition that could have caused her depression. (Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 20.)

The court first addresses whether Defendant's determination that Plaintiff's claim of fibromyalgia as a disabling impairment was not supported by the record was arbitrary and capricious. The court then turns to whether Defendant's decision to apply a mental health limitation duration of twenty-four months to Plaintiff's claim for LTD benefits was arbitrary and capricious.

**1.      Defendant's Determination Regarding Plaintiff's Fibromyalgia Claim Was Arbitrary and Capricious.**

The Third Circuit, adopting the words of Judge Posner, describes fibromyalgia as:

a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. See Frederick Wolfe et al.,

"The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 Arthritis & Rheumatism 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, Current Medical Diagnosis & Treatment 1995 708-09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch.

Post, 501 F.3d at 159 n.2 (quoting Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996)). The

Ninth Circuit employs a similar, helpful definition:

Fibromyalgia is a type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression. See Fibromyalgia, Arthritis Foundation Pamphlet at 1, 5 (1992). The depression and anxiety associated with fibromyalgia are believed to be symptoms of this muscular disease, rather than causes of it. Researchers suggest that there is a possible "biologic link" between fibromyalgia and some forms of depression and chronic anxiety. Id. at 5. In addition, the Pamphlet reports that while "the single exact cause of fibromyalgia is unknown[,] . . . a number of stresses . . . may precipitate the generalized pain, fatigue, sleep, and mood problems that characterize fibromyalgia." Id. at 7. It is often difficult to diagnose fibromyalgia, and "often people with fibromyalgia have undergone many tests and have seen many different specialists while in search of an answer." Id. at 10.

Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., 125 F.3d 794, 796 (9th

Cir. 1997).

Because chronic fatigue syndrome cases are analogous to the situation presented by

fibromyalgia cases, that case law is discussed here. Under the arbitrary and capricious standard

of review, the Third Circuit has held that the requirement of objective medical evidence to

establish the etiology of chronic fatigue syndrome, which is defined by the absence of objective

medical evidence, is arbitrary and capricious, as it creates an impossible hurdle for claimants.

Mitchell, 113 F.3d at 442-43; see Lemaire v. Hartford Life & Accident Ins. Co., 69 Fed. Appx.

88, 93 (3d Cir. 2003) (unpublished) (following Mitchell and affirming the reversal of an

administrator's denial of LTD benefits, where the administrator credited evidence of depression

as objective, but required objective medical evidence to establish chronic fatigue syndrome, and

determined that the claimant was solely disabled due to mental disability).

     In Mitchell v. Eastman Kodak Co., the administrator denied the plaintiff's claim for LTD

benefits due to his condition of chronic fatigue syndrome because plaintiff had failed to provide

objective medical evidence that his condition was totally disabling.  113 F.3d at 435-36.  The

Third Circuit applied the arbitrary and capricious standard of review.  Id. at 437-39.  The Third

Circuit considered the difficulty of diagnosing chronic fatigue syndrome and understanding how

the condition was disabling, especially early in the diagnostic process.  Id. at 441.  The court

found that there was clear support for plaintiff's contention that chronic fatigue symptom

rendered him totally unable to engage in substantial gainful work where the symptoms of chronic

fatigue syndrome had remained consistent over time since the onset and there was "later,

undisputed evidence from a doctor more knowledgeable about the diagnosis and symptomatology

of [chronic fatigue syndrome]."  Id.  Recognizing that the diagnostic process with respect to

chronic fatigue syndrome can evolve over time, the Third Circuit elaborated, "because chronic

fatigue syndrome is diagnosed partially through a process of elimination, an extended medical

history of 'nothing-wrong' diagnoses is not unusual for a patient who is ultimately found to be

suffering from the disease," and further that "an early [doctor's] report that 'I am unable to find the cause' does not contradict a later report that 'I have now found the cause.'" Id. at 442 (quoting Sisco v. U.S. Dep't of Health & Human Servs., 10 F.3d 739, 745 (10th Cir. 1993)).

The Third Circuit held that if by "objective medical evidence" the plan administrator meant evidence sufficient to show that the claimant could not engage in any substantial gainful work, then the denial was based on a severe mischaracterization of the record.  Id.  If by "objective medical evidence" the plan administrator meant "clinical evidence of the etiology of allegedly disabling symptoms," the Third Circuit concluded that "[a]lthough in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, . . . it was arbitrary and capricious to require such evidence in the context of this Plan and [chronic fatigue syndrome]." Id. at 442-43.  The court found not only that the plan at issue did not require clinical evidence of the etiology of the alleged disabling condition, but that, because chronic fatigue syndrome does not have a known etiology, "it would defeat the legitimate expectations" of plan participants to require those with chronic fatigue syndrome to make such a showing.  Id. at 443.

A Third Circuit panel has indicated that the holding in Mitchell should be extended to cases involving fibromyalgia.  Steele v. Boeing Co., 225 Fed. Appx. 71, 74-75 (3d Cir. 2007) (unpublished).  In Steele v. The Boeing Company, the administrator denied plaintiff's short term disability benefits claim due to fibromyalgia because he failed to provide objective and/or diagnostic documentation to support his claimed severe impairment, despite statements from his doctor that there was no diagnostic test specific for fibromyalgia.  Id. at 73.  Although a doctor employed by the administrator to conduct an administrative review found that plaintiff's medical

file supported the presence of a long-standing chronic pain syndrome, the administrator

determined that, in the absence of physical evaluations or significant corresponding pathology,

the subjective reporting of pain alone was not enough to establish disability.  Id.

Applying the arbitrary and capricious standard of review, the Third Circuit found that it

was impermissible to require objective evidence for fibromyalgia, a condition based on

subjective complaints of pain and that cannot be proved objectively, and that the effect of such

requirement would be to eliminate arbitrarily and capriciously all disability claims based on

fibromyalgia.  Id. at 74-75.  The court similarly refused to find that the findings of the doctor

employed by the administrator constituted substantial evidence in support of the administrator's

determination.  Id. at 75.  That doctor rejected the disability determination of plaintiff's treating

doctors because they had differing opinions as to the cause of plaintiff's condition, but the

reviewing doctor did not point to any "reliable evidence that conflicted with a treating

physician's evaluation."  Id. (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834

(2003) (quotations and alterations omitted)).  Because the reviewing doctor "simply rephrased

the inappropriate reasons originally given for the denial, namely, that there was no objective

evidence of a condition that cannot be proven objectively," the court concluded there was no

substantial evidence to support the denial of disability benefits.  Id.

Applying Mitchell and Steele to the present case, the court finds that Defendant's denial

of Plaintiff's claim for LTD benefits was not supported by substantial evidence and was

erroneous as a matter of law.

### a.   *Defendant's Denial Was Not Supported By Substantial Evidence.*

Since the onset of her condition in 2002, Plaintiff has been evaluated by at least a urologist, three neurologists, a rheumatologist, two psychiatrists, her family doctor, and a sleep specialist, and subjected to a battery of tests, all in an effort to determine what ails her.  As Plaintiff admits, different doctors initially have had different views as to what may be disabling Plaintiff, whether chronic pain syndrome, fibromyalgia, multiple sclerosis, or lyme disease.  The diagnoses of some individual doctors, such as Dr. Binning and Dr. Trievel, also evolved over time, as other possible diseases, through a process of elimination, were discounted after testing.

Although Defendant urges the court to find this evolving diagnostic process unreliable, (see, e.g., Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 22, 24), it is consistent with the process by which fibromyalgia typically is identified.  See Steele, 225 Fed. Appx. at 74-75; Post, 501 F.3d at 159 n.2; cf. Mitchell, 113 F.3d at 441-42.  The etiology of Plaintiff's symptoms is unclear, nor is it clear whether they were triggered by her initial interstitial cystitis, whether she has since developed an independent chronic pain disease, or whether there is some other cause.  This is unsurprising, as fibromyalgia has no known etiology.  See Lang, 125 F.3d at 796.

As in Mitchell, there is clear support here for Plaintiff's contention that fibromyalgia rendered her totally unable to engage in substantial gainful work because her fibromyalgia-like symptoms have remained consistent over time during the covered period and there is later, undisputed evidence in support of the fibromyalgia diagnosis from doctors with expertise in fibromyalgia, such as a rheumatologist and sleep expert.  See Mitchell, 113 F.3d at 441.  The record reveals that Plaintiff began exhibiting the same consistent symptoms early on – fatigue, loss of concentration, severe pain, numbness, and depression, among other symptoms – which

were given the possible diagnosis of fibromyalgia as early as March 30, 2004 by Dr. Binning, Plaintiff's neurologist, (PRU 000240).  Although, as of October 13, 2004, Dr. Binning was unsure of this diagnosis, (PRU 000247), the diagnosis of fibromyalgia was later reinforced and confirmed by several treating doctors, including Dr. Adelman, a neurologist, on October 22, 2004, (PRU 000242), Dr. Mark, the sleep specialist, on November 1, 2005, (PRU 000115), Dr. Whalen, a rheumatologist, on November 5, 2005, (PRU 000129), and Dr. Trievel, Plaintiff's family doctor, on November 14, 2005, (PRU 000128).

Defendant's reviewing experts' reports, upon which Defendant relied  – Dr. Cox's in October 2003, (PRU 000300-04), Dr. Brock's on June 7, 2005, (PRU 000156), and Dr. Day's on August 2, 2005, (PRU 000509-10) – predate the confirmed diagnosis of fibromyalgia by Dr. Mark, Dr. Whalen, and Dr. Trievel, following the sleep study and comprehensive rheumatological evaluation.  Despite this medical record indicating a diagnosis of fibromyalgia from March 2004 to November 2005, Defendant did not submit this matter to an expert who had experience to opine on fibromyalgia or perform the accepted "trigger point" test on the eighteen tender spots on the body, see Post, 501 F.3d at 159 n.2.

Inexplicably, Defendant insists that the only medical records Plaintiff provided regarding her fibromyalgia claim were those dated between September 30, 2005 and December 8, 2005, approximately seventeen months after June 24, 2004, when Defendant initially determined that Plaintiff no longer met the definition for total disability.  (See PRU 000082; see also Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 19-20, 24-25 ("[T]he contention that plaintiff suffered from fibromyalgia did not come until 17 months after the benefits were terminated.").)  The record is clear that Dr. Binning opined as to the possible diagnosis of fibromyalgia as early

as March 30, 2004.  (PRU 000240.)  Moreover, although Defendant did not include the basis for

its determination in its June 24, 2004 decision, Defendant's own internal record, dated June 24,

2004, references Dr. Binning's reports from April and May 2004, which stated that Plaintiff's

symptoms were compatible with fibromyalgia.  (See PRU 000258-63, 000503.)

Indicative of Defendant's general attitude toward Plaintiff's fibromyalgia claim,

Defendant at that time glibly dismissed her fibromyalgia claim as not being an impairing

condition to perform regular occupational sedentary work.  (See id.)  If Defendant meant by this

that, in general, fibromyalgia can never be an impairing condition, this is patently incorrect.  If

Defendant meant that Plaintiff's fibromyalgia specifically was not impairing as applied to her,

this determination is not supported by substantial evidence, as Defendant did not proffer any

appropriate evidence in rebuttal.  See Nord, 538 U.S. at 834 (holding that plan administrators

"may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of the

treating physician[,] . . . nor may courts impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation").  Indeed, Defendant in its June 24, 2004 decision did not include any bases for its

determination in its decision letter.  (See PRU 000258-63.)

The evidence of record, absent rebuttal in the form of reliable evidence conflicting with

the treating doctors' evaluations, see Nord, 538 U.S. at 834, establishes disability at least as of

June 30, 2004.  Furthermore, as discussed in more detail below, the reviewing doctors here

simply responded to an inappropriate posture posed by Defendant, "namely, that there was no

objective evidence of a condition that cannot be proven objectively," Steele, 225 Fed. Appx. at

75, and Defendant relied on this to find the same.  The court therefore concludes there was not

substantial evidence to support the denial of disability benefits as to Plaintiff's fibromyalgia claim.

### b.    *Defendant's Requirement Of Objective Evidence Was Erroneous As A Matter of Law.*

Although Defendant did not directly ask Plaintiff to provide objective medical evidence of her fibromyalgia claim, which cannot be proven by objective medical evidence, Defendant implicitly required objective medical evidence, making it impossible for Plaintiff to comply.  As Plaintiff correctly argues, Defendant "back-doored" the requirement for objective medical evidence for fibromyalgia by asking its two reviewing doctors to assess Plaintiff's fibromyalgia claim through the lens of objective medical evidence, and then by relying on those assessments for its denial.

Defendant asked both Dr. Bock and Dr. Day for objective findings that would support the etiology of Plaintiff's complaints.  (See PRU 000151, 000161, 000508-09.)  As to the possible fibromyalgia diagnosis, Dr. Bock simply followed the question put to him when he stated that there were no physical findings on examination to support the fibromyalgia diagnosis on a clinical basis (see PRU 000156) – nor, could there have been, as fibromyalgia cannot be proven objectively.  It is notable that Dr. Bock also qualified his answer that the medical records did not "objectively support a physical etiology from a neurologic standpoint," (PRU 000156), because fibromyalgia is a rheumatological disorder, not neurological.

Dr. Day correctly stated that fibromyalgia was a "subjective chronic pain problem," but cryptically continued that "[n]o restrictions would be placed for this and the limitations are

related to the subjective pain complaints." (See PRU 000510.)  As Plaintiff points out, Dr. Day

may have meant that no restrictions should ever be placed on a person with fibromyalgia, which

is contrary to the great weight of medical understanding.  Or, as Plaintiff suggests, perhaps Dr.

Day meant that a doctor in issuing restrictions for fibromyalgia looks to the subjective complaints

and that limitations are based on subjective complaints.  Defendant's reviewing experts did not

consider Plaintiff's subjective complaints.

In its determinations, Defendant relied on the answers of its reviewing doctors, which had

been filtered through the objective medical evidence requirement contained in Defendant's

questions, to, in turn, find that no physical findings substantiated Plaintiff's claim of

fibromyalgia.  In its June 14, 2005 affirmance of its decision, Defendant denied LTD benefits

with respect to Plaintiff's fibromyalgia claim because, as Dr. Bock had stated, there were no

"specific findings on physical examination to support this diagnosis." (PRU 000147.)  In its

August 29, 2005 decision, in which Defendant affirmed its denial for a second time, Defendant

inexplicably did not address Plaintiff's fibromyalgia claim, even though Dr. Day credited it as a

subjective chronic pain problem.  (See PRU 000138-39.)  Finally, in its third affirmance on

November 14, 2005, Defendant reiterated that there was not "sufficient medical evidence" to

support impairment in Plaintiff's functioning due to fibromyalgia.  (PRU 000082.)  Indeed,

Defendant in its motion for summary judgment continued to restate its erroneous reliance on

objective medical evidence, stating: "the records supplied in support of [Plaintiff's] appeal reveal

that there was no objective documentation or clinical presentation of . . . fibromyalgia." (See

Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 22.)

As the Third Circuit held in Mitchell and Steele, it was impermissible as a matter of law

for Defendant to require physical findings or objective medical evidence, whether directly or through reliance on experts who frame their opinions in terms of objective findings, for Plaintiff to prove her fibromyalgia claim.  See Steele, 225 Fed. Appx. at 74-75; Mitchell, 113 F.3d at 442-43.  Defendant's denial of LTD benefits because of an absence of "objective findings" with respect to Plaintiff's fibromyalgia claim was therefore arbitrary and capricious.  Moreover, because the Policy language here, like in Mitchell, does not contain a limitation of coverage to diseases that can be objectively determined and because fibromyalgia does not have a known etiology, "it would defeat the legitimate expectations" of plan participants to require those with fibromyalgia to make such a showing.  See Mitchell, 113 F.3d at 443.

2.     **Defendant's Imposition of the Policy's Mental Health Limitation**.

Because Defendant impermissibly precluded Plaintiff's fibromyalgia claim by requiring objective medical evidence, the court need not address Defendant's flawed argument that, from the outset, Plaintiff's disability of interstitial cystitis was caused in part by her depression and that, after her interstitial cystitis improved, she was disabled solely due to her depression, and therefore was subject to the Policy's mental health limitation.  Defendant also cannot now argue that, even if Plaintiff was disabled due to fibromyalgia, her disability was caused in part or in whole by a mental limitation, pre-existing or not.  In denying Plaintiff the LTD benefits, Defendant never considered whether Plaintiff's alleged fibromyalgia was caused by a mental limitation or whether her depression was a secondary consequence of the fibromyalgia, because it refused, through its objective evidence requirement, to acknowledge her fibromyalgia as a substantial impairment.  The court simply notes that fibromyalgia is an affliction with a physical

source and is often accompanied by depression.  See Lang, 125 F.3d at 799.

The court agrees with Plaintiff that Defendant improperly attempted to "pigeon hole" Plaintiff into a mental health limitation without properly considering her diagnosis, during the coverage period, of fibromyalgia-like symptoms that over time was confirmed by the consensus of Plaintiff's treating doctors.  Therefore, Plaintiff is entitled to reinstatement of her LTD benefits retroactive from July 1, 2004, and clarification of her rights to future benefits under the Policy.

The court denies Plaintiff's request for injunctive relief.  Although there are no specific procedures under ERISA covering the issuance of injunctions, courts can apply the traditional standard governing injunctive relief: whether a plaintiff has alleged irreparable harm and inadequacy of legal remedies.  See, e.g., Bellanger v. Health Plan of Nev., Inc., 814 F. Supp. 914, 917 (D. Nev. 1992).  To the extent that Plaintiff seeks injunctive relief applicable to all Policy participants, such relief would be improper as this matter was not brought as a class action and Plaintiff's standing has not been established.  To the extent that Plaintiff seeks injunctive relief as applied to her, the legal remedy to which Plaintiff is entitled, i.e., the retroactive reinstatement of LTD benefits, is adequate to make her whole.  Moreover, any future determination by Defendant regarding Plaintiff's eligibility for LTD benefits based on her fibromyalgia claim must conform to this opinion and order.

## V.  Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is granted and

Defendant's Motion for Summary Judgment is denied.

An appropriate Order follows.